# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

REACT PRESENTS, INC.,

               Plaintiff,              CASE NO. 16-13288
                                              HON. DENISE PAGE HOOD

v.

EAGLE THEATER ENTERTAINMENT,
LLC,
BLAIR MCGOWAN,
AMIR DAIZA,
MATTHEW FARRIS

               Defendants.

_____/

## ORDER GRANTING IN PART AND DENYING IN PART COUNTER DEFENDANT REACT PRESENT'S INC.'S MOTION TO DISMISS DEFENDANTS' COUNTERCLAIMS [#13]

## I.    BACKGROUND

### A. 16-13288, Procedural Background

On September 12, 2016, Plaintiff React Presents, Inc. ("React") filed a Complaint against Defendants Eagle Theater Entertainment, LLC ("Eagle"), Blair McGowan ("McGowan"), Amir Daiza ("Daiza"), and Matthew Farris ("Farris") alleging breach of contract (Count I), fraud (Count II), breach of fiduciary duty (Count III), violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO") (Count IV), and unjust enrichment (Count V). (Doc # 1)  Defendants filed a Motion for a More Definite Statement on November 21, 2016 (Doc # 5),

1

which was denied by Magistrate Judge David R. Grand (Doc # 10). Defendants filed a responsive pleading on February 7, 2017 alleging the following Counterclaims against React: violation of Section 1 of the Sherman Antitrust Act (Count I), violation of the Michigan Antitrust Reform Act (Count II), and unjust enrichment (Count III). (Doc # 11) This matter is presently before the Court on React's Motion to Dismiss Defendants' Counterclaims, filed on February 28, 2017. (Doc # 13) Defendants filed a Response on April 7, 2017. (Doc # 19) React filed a Reply on April 21, 2017. (Doc # 20) The Court held a hearing on the motion on May 3, 2017.

### B. 16-13311 (Related Case), Procedural Background

On September 13, 2016, Plaintiff SFX-React Operating LLC ("SFX") filed a Complaint against Defendants Eagle Theater Entertainment, LLC ("Eagle"), Blair McGowan ("McGowan"), Amir Daiza ("Daiza"), and Matthew Farris ("Farris") alleging breach of contract (Count I), fraud (Count II), breach of fiduciary duty (Count III), violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO") (Count IV), and unjust enrichment (Count V). (Doc # 1) Defendants filed a Motion for a More Definite Statement on November 21, 2016 (Doc # 6), which was denied by Magistrate Judge David R. Grand (Doc # 12). Defendants filed an amended responsive pleading on February 7, 2017 alleging the following counterclaims against SFX: violation of Section 1 of the Sherman Antitrust Act

(Count I), violation of the Michigan Antitrust Reform Act (Count II), and unjust enrichment (Count III). (Doc # 16) SFX filed a Motion to Dismiss Defendants' Counterclaims on February 28, 2017. (Doc # 18) Defendants filed a Response on April 7, 2017. (Doc # 22) SFX filed a Reply on April 21, 2017. (Doc # 23) The Court held a hearing on the motion on May 3, 2017.

### C. Factual Background

React was a club, concert, and festival promotion company. In 2014, SFX acquired at least some of React's assets, and Defendants allege that SFX is the successor of React. SFX is also in the business of promoting clubs, concerts, and festivals. Defendants own and operate several concert venues including Elektricity, a nightclub in Pontiac, Michigan. Elektricity serves as a concert venue allegedly exclusively for electronic musicians, DJs, and other artists who perform electronic dance music ("EDM"). Defendant McGowan owns Defendant Eagle and is its managing member. Defendant Daiza is responsible for overseeing Eagle's operations and overseeing the bookkeeping. Defendant Farris is Eagle's bookkeeper.

React began putting on large EDM concerts and festivals in the Chicago area on or about 2008. The Spring Awakening Music Festival has been held in Chicago in June of every year since that time. React organized and operated other festivals featuring EDM artists throughout the Midwest including the Summer Set Music

Festival (held in Somerset, Wisconsin towards the end of summer each year), the North Coast Music Festival (held in Chicago in September of each year), and Freaky Deaky Halloween (held in Chicago in October of each year).

Defendants allege that each of the festivals featured approximately 100 EDM artists. Defendants further allege that when React hired artists to perform at any of its festivals or concerts, each artist was required to sign an agreement containing a radius clause. Each radius clause stipulated that the artist would not play any other shows within a certain radius of the location of React's event for a certain period of time. Defendants allege that the radius clauses prohibited artists from playing anywhere up to within a 500 mile radius of React's event for periods of 60, 90, or 120 days prior to and following the date of the event. According to Defendants, the radius clauses made it nearly impossible for many nationally recognized EDM artists to play anywhere else in the Midwest, including at Elektricity and elsewhere in Metro Detroit, because they had played at one or more of React's events which occurred throughout the calendar year. Defendants note several major cities in or near the Midwest which are within a 500 mile radius of Chicago (Detroit, Buffalo, Kansas City, Huntsville, Cleveland, Toronto, Pittsburg, St. Louis, Minneapolis, and Thunder Bay). Defendants allege that the purported purpose of the radius clauses was to protect attendance at React's events from

being diminished by fans attending another performance of a featured artist elsewhere around the same date.

Defendants allege that, in 2012, React became aware that several nationally recognized EDM artists that had performed at one or more of its events were receiving offers to play at venues in Metro Detroit. At that time, React contacted the managers of Eagle and proposed waiving its radius clauses so that the artists could perform at Eagle in exchange for 50 percent of all profits of any concert featuring EDM artists within its control, including profits generated from tickets, merchandise, and concessions. According to Defendants, React threatened that if Eagle did not agree to the proposal, React would approach other music promoters in Metro Detroit and attempt to further restrict the EDM market.

At first, React and Eagle orally agreed to split the profits 50-50. React was responsible for negotiating and contracting with artists, advertising, marketing, and promoting the concerts. Eagle was responsible for operating the venue and selling tickets at the box office. In November 2013, the parties memorialized their agreement and practices in a Co-Promotion Agreement. Defendants allege that Eagle was forced to enter into this unfair business arrangement with React whenever it attempted to book a nationally recognized EDM artist in Metro Detroit. React and Eagle co-promoted approximately 100 EDM concerts from 2012 until React's assets were acquired by SFX in April 2014. After each concert,

Eagle would provide React with a "settlement" document purporting to indicate the profits generated. The settlements were allegedly prepared by Defendant Farris, overseen and approved by Defendant Daiza, and approved by Defendant McGowan. React would review the settlements, and Eagle would then mail a check to React for their share of the profits.

According to Defendants, in 2014, SFX acquired the Spring Awakening Music Festival, Summer Set Music Festival, North Coast Music Festival, and Freaky Deaky Halloween—and SFX continues to operate them each year. SFX has also organized and operates additional festivals featuring EDM artists in the Midwest, including Mamby on the Beach (held in Chicago in July of each year) and Reaction New Year's Eve (held in Chicago on New Year's Eve each year). Defendants allege that each of the festivals feature approximately 100 EDM artists. Defendants further allege that when SFX hires artists to perform at any of its festivals or concerts, it requires each artist to sign an agreement containing a radius clause of the same kind as React's radius clauses described above. According to Defendants, the radius clauses make it nearly impossible for many nationally recognized EDM artists to play anywhere else in the Midwest, including at Elektricity and elsewhere in Metro Detroit (unless SFX agrees to waive the radius clauses) because the artists have played at one or more of SFX's events which occur throughout the calendar year.

In April 2014, SFX and Eagle began co-promoting concerts under the same terms as the prior agreement between React and Eagle. According to Plaintiffs, the transition was seamless because SFX was operated by the principals of React. In May 2014, SFX and Eagle entered into a Co-Promotion Agreement, the material terms of which were identical to the agreement between React and Eagle. Defendants allege that Eagle is forced to enter into this unfair business arrangement with SFX whenever it attempts to book a nationally recognized EDM artist in Metro Detroit. SFX and Eagle have co-promoted at least 83 EDM concerts from April 2014 through 2016. After each concert, Eagle provides SFX with a settlement document purporting to indicate the profits generated. The settlements have been allegedly prepared by Defendant Farris, overseen and approved by Defendant Daiza, and approved by Defendant McGowan. SFX reviews the settlements, and Eagle then mails a check to SFX for their share of the profits.

In January 2016, a disgruntled Eagle employee provided React and SFX with what Plaintiffs allege to be true and accurate accounting records disclosing that Eagle kept two sets of books showing receipts from the concerts. According to React and SFX, Eagle's settlements systematically and fraudulently underreported the true profits from the concerts. According to SFX, Eagle has also

withheld payments for at least 16 concerts that SFX and Defendants have co-promoted since March 2016.

In February 2016, SFX filed a Petition for Bankruptcy pursuant to chapter 11 of the Bankruptcy Code. In April 2016, Eagle was served with a Notice of Bar Dates for Filing Proofs of Claim, which was May 17, 2016. A bankruptcy Plan of Reorganization was confirmed on November 15, 2016.[1]

In September 2016, React and SFX brought actions against Defendants alleging that they suffered hundreds of thousands of dollars in damages because, as a result of Defendants systematic and fraudulent underreporting, React and SFX almost always received less from the concerts than the 50 percent of the profits to which they were entitled under the co-promotion agreements.

In February 2017, Defendants counterclaimed that React and SFX used the control they gained over EDM artists via the radius clauses as monopolistic leverage to enter the Metro Detroit EDM market. Defendants further counterclaim

---

[1] SFX, and not the bankruptcy trustee, filed the Complaint in this action. In the bankruptcy setting, a debtor has an affirmative duty to disclose all of his assets to the bankruptcy court. *Stephenson v. Malloy*, 700 F.3d 265, 267 n.2 (6th Cir. 2012) (citing 11 U.S.C. § 521(a)(1)). A cause of action is an asset that must be scheduled under § 521(a)(1). *See Eubanks v. CBSK Fin. Grp., Inc.*, 385 F.3d 894, 897 (6th Cir. 2004).

At the hearing on May 3, 2017, the Court asked Counsel for SFX to brief the issue of whether the bankruptcy trustee is the real party in interest. On May 10, 2017, SFX filed a Supplemental Brief and attached the Bankruptcy Plan and the Litigation Trust Agreement. (Doc # 24) Defendants did not file a response. These documents indicate that the Litigation Trustee is aware of this lawsuit, and that this lawsuit was specifically excluded from the definition of "Litigation Trust Claim." Accordingly, the Court is satisfied that SFX is the real party in interest.

that React was unjustly enriched when it received hundreds of thousands of dollars from alcohol sales at the concerts.

## II.    ANALYSIS

### A. Standard of Review

Rule 12(b)(6) of the Federal Rules of Civil Procedure provides for a motion to dismiss for failure to state a claim upon which relief can be granted.  Fed. R. Civ. P. 12(b)(6).  This type of motion tests the legal sufficiency of the plaintiff's complaint.  *Davey v. Tomlinson*, 627 F. Supp. 1458, 1463 (E.D. Mich. 1986). When reviewing a motion to dismiss under Rule 12(b)(6), a court must "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff."  *Directv Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007).  A court, however, need not accept as true legal conclusions or unwarranted factual inferences."  *Id.* (quoting *Gregory v. Shelby Cnty.*, 220 F.3d 443, 446 (6th Cir. 2000)).   "[L]egal conclusions masquerading as factual allegations will not suffice."  *Edison v. State of Tenn. Dep't of Children's Servs.*, 510 F.3d 631, 634 (6th Cir. 2007).  As the Supreme Court has explained, "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do.  Factual allegations must be enough to raise a right to relief above the speculative level… ."  *Bell Atlantic*

*Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citations omitted); *see LULAC v. Bresdesen*, 500 F.3d 523, 527 (6th Cir. 2007).  To survive dismissal, the plaintiff must offer sufficient factual allegations to make the asserted claim plausible on its face.  *Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009).  "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*  "The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully.  Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief."  *Id.* at 678 (internal citations and quotations omitted).  The court primarily considers the allegations in the complaint, although matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint may also be taken into account.  *Amini v. Oberlin Coll.*, 259 F.3d 493, 502 (6th Cir. 2001).

### B. Violation of Section 1 of the Sherman Antitrust Act (Count I)

#### 1. *Antitrust Counterclaim Against React*

##### a.  Statute of Limitations

React first argues that Defendants' antitrust counterclaim is time-barred because it accrued in 2012 when React and Defendants entered into their oral co-promotion agreement—over four years before Defendants brought their

Counterclaim. React further argues that Defendants have not alleged a continuing violation.

Defendants respond that their claim is a continuing claim and not time-barred because the 2012 co-promotion agreement is not the overt act that offended the Sherman Act and injured the EDM market, but rather the repeated performance contracts with EDM artists that contained radius clauses.

"Any action to enforce any cause of action under [the Sherman Antitrust Act] shall be forever barred unless commenced within four years after the cause of action accrued." 15 U.S.C. § 15b. Accrual generally occurs and the limitation period commences "when a defendant commits an act that injures a plaintiff's business." *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 338 (1971). "[W]hen a continuing antitrust violation is alleged, a cause of action accrues each time a plaintiff is injured by an act of the defendants." *Peck v. General Motors Corp.*, 894 F.2d 844, 849 (6th Cir. 1990) (internal quotations omitted). However, "even when a plaintiff alleges a continuing violation, an overt act by the defendant is required to restart the statute of limitations and the statute runs from the last overt act." *Id.* (internal quotations omitted).

> An overt act that restarts the statute of limitations is characterized by two elements: (1) it must be a new and independent act that is not merely a reaffirmation of a previous act; and (2) it must inflict new and accumulating injury on the plaintiff. Acts that simply reflect or implement a prior refusal to deal, or acts that are merely unabated

inertial consequences of a single act, do not restart the statute of limitations.

*DXS, Inc. v. Siemens Med. Sys., Inc.*, 100 F.3d 462, 467-68 (6th Cir. 1996).

In this case, viewing the facts in the light most favorable to Defendants and drawing all reasonable inferences in their favor, each performance agreement between React and the EDM artists that played at React's events contained a radius clause. React entered into contracts with hundreds of EDM artists, and these contracts expired in less than a year. Each year, React entered into virtually identical contracts with hundreds of EDM artists, as it operated several annual festivals that took place each year, until React was acquired by SFX in 2014. Based on React's Complaint, as admitted in paragraph 20 of Defendants' Answer, React and Defendants co-promoted concerts in 2014. It can be inferred from the 2014 co-promotions that the artists playing at those concerts were subject to radius clauses that React had to agree to waive via the co-promotion agreement. Defendants allege that the radius clauses made it nearly impossible for many nationally recognized EDM artists to play anywhere else in the Midwest, including at Elektricity and elsewhere in Metro Detroit (unless React agreed to waive the radius clauses) because the artists had played at one or more of React's events which occur throughout the calendar year.

The Court finds that the alleged violations of the Sherman Act are the individual performance contracts containing radius clauses between React and the

EDM artists. It was not the co-promotion agreement that limited Defendants' ability to book EDM artists to play at their venues, and the co-promotion agreement contained no radius clause. The Court further finds that each performance contract between React and the EDM artists was an overt act by React that restarted the statute of limitations because each performance contract was a new and independent act that allegedly inflicted new and accumulating injury on Defendants' business as well as on the EDM market in Metro Detroit. Accordingly, Defendants' cause of action accrued each time they were allegedly injured by React's performance contracts with EDM artists containing radius clauses. The alleged violation was continuing as late as 2014, so Defendants' Counterclaim filed in February 2017 is within the four-year statute of limitations and not time-barred.

React next argues that Defendants' antitrust counterclaim should be dismissed because Defendants have not alleged a *per se* violation of the Sherman Act and have failed to plead sufficient allegations to satisfy the rule of reason test. The Court examines each of these arguments in turn.

### b. Per Se Violation of the Sherman Antitrust Act

React argues that Defendants have not alleged a *per se* violation of the Sherman Act because: (1) the alleged radius clauses in React's performance contracts are vertical restraints; (2) prior cases have not established the

anticompetitive effects of a sufficiently similar business practice; (3) other courts have held that radius clauses are not *per se* violations; and (4) the alleged radius clauses do not completely lack redeeming competitive rationales.

Defendants respond that React's actions were unreasonable *per se* because: (1) they operated to foreclose competitors form a substantial market; and (2) they resulted in control of the supply side of the EDM market in Metro Detroit.

Section 1 of the Sherman Antitrust Act provides that, "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal." 15 U.S.C. § 1. The Supreme Court has held that Congress intended to prohibit only "unreasonable" restraints of trade. *Id.* at 342-43. In order to establish a violation of Section 1 of the Sherman Antitrust Act, three elements must be met: (1) an agreement, (2) affecting interstate commerce, that (3) unreasonably restrains trade. *White & White, Inc. v. Am. Hosp. Supply Corp.*, 723 F.2d 495, 504 (6th Cir. 1983). Generally, restraints of trade are analyzed under the "rule of reason." *State Oil Co. v. Khan*, 522 U.S. 3, 10 (1997).

There are some restraints, however, that are deemed unlawful *per se* because they "have such predictable and pernicious anticompetitive effects, and such limited potential for procompetitive benefit." *Id.* "*Per se* treatment is appropriate once experience with a particular kind of restraint enables the Court to predict with

confidence that the rule of reason will condemn it." *Id.* (internal quotations omitted). The *per se* rule is applied when the restraint "facially appears to be one that would always or almost always tend to restrict competition and decrease output." *In re Cardizem CD Antitrust Litig.*, 332 F.3d 896, 906 (6th Cir. 2003) (internal quotations omitted). The *per se* approach applies a conclusive presumption of illegality to certain types of agreements and no consideration is given to the intent behind the restraint, to any claimed pro-competitive justifications, or to the restraint's actual effect on competition. *Id.*

In this case, the alleged radius clauses at issue are vertical restraints because they are agreements between React (the promoter) and the EDM artists—actors at different levels of the market structure. *See Care Heating & Cooling, Inc. v. Am. Standard, Inc.*, 427 F.3d 1008, 1013 (6th Cir. 2005).

> Unlike many horizontal agreements [among competitors at the same level of market structure], such as group boycotts, price cartels, and monopolies, that are entirely devoid of redeeming competitive value and therefore present "clear cut cases," vertical restrictions possess the "redeeming virtue" of promoting interbrand competition . . . . Thus, where a plaintiff alleges a vertical restraint of trade, the rule of reason applies.

*Id.* Defendants do not allege any horizontal agreement. Defendants do not allege that React's conduct involves horizontal price fixing, group boycotts, bid-rigging, or vertical minimum price distribution restraints.

React correctly notes that Defendants have failed to identify any case in which radius clauses between a promoter and artists like the ones at issue here were held to violate antitrust law. "Except where courts have already carved out certain categories of offenses as proscribed *per se*, there is an automatic presumption in favor of the rule of reason standard." *Expert Masonry, Inc. v. Boone Cnty., Ky.*, 440 F.3d 336, 343 (6th Cir. 2006) (internal quotations omitted). Applying the *per se* standard "should be done reluctantly and infrequently, informed by other courts' review of the same type of restraint, and only when the rule of reason would likely justify the same result." *In re Southeastern Milk Antitrust Litig.*, 739 F.3d 262, 271 (6th Cir. 2014).

The Court finds that Defendants have not alleged facts that would place this case into one of the limited categories that have been collectively deemed *per se* anticompetitive. The economics of the radius clauses at issue do not on their face require a presumption of anti-competitiveness. *See It's My Party, Inc. v. Live Nation, Inc.*, 88 F. Supp. 3d 475, 502 (noting that, "<u>while not *per se* illegal</u>," exclusive dealing arrangements, such as contracts between a national promoter and artists requiring the artists to work only with the national promoter via exclusivity clauses or broad radius clauses, may be an improper means of acquiring or maintaining a monopoly power) (emphasis added).

*c. Quick Look Analysis*

Defendants argue that the Court should find that React's conduct was unlawful under the "quick-look" analysis, which would not require an analysis of the surrounding market.

The Supreme Court has explained the quick-look analysis as follows.

> In *Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Okla.*, 468 U.S. 85 (1984), we held that a "naked restraint on price and output requires some competitive justification even in the absence of a detailed market analysis." *Id.* at 110. Elsewhere, we held that "no elaborate industry analysis is required to demonstrate the anticompetitive character of" horizontal agreements among competitors to refuse to discuss prices, *Nat'l Soc. of Prof'l Engineers v. United States*, 435 U.S. 679, 692 (1978), or to withhold a particular desired service, *FTC v. Indiana Fed'n of Dentists*, 476 U.S. 447, 459 (1986) (quoting *Nat'l Soc. of Prof'l Engineers*, *supra*, at 692). In each of these cases, which have formed the basis for what has come to be called abbreviated or "quick-look" analysis under the rule of reason, an observer with even a rudimentary understanding of economics could conclude that the arrangements in question would have an anticompetitive effect on customers and markets. In *Nat'l Collegiate Athletic Ass'n*, the league's television plan expressly limited output (the number of games that could be televised) and fixed a minimum price. 468 U.S. at 99-100. In *Nat'l Soc. of Prof'l Engineers*, the restraint was "an absolute ban on competitive bidding." 435 U.S. at 692. In *Indiana Fed'n of Dentists*, the restraint was "a horizontal agreement among the participating dentists to withhold from their customers a particular service that they desire." 476 U.S. at 459. As in such cases, quick-look analysis carries the day when the great likelihood of anticompetitive effects can easily be ascertained. *See Law v. Nat'l Collegiate Athletic Ass'n*, 134 F.3d 1010, 1020 (10th Cir. 1998) (explaining that quick-look analysis applies "where a practice has obvious anticompetitive effects"); *Chicago Prof'l Sports Ltd. Partnership v. Nat'l Basketball Ass'n*, 961 F.2d 667, 674-76 (7th Cir. 1992) (finding quick-look analysis adequate after assessing and rejecting logic of proffered procompetitive justifications) . . . .

*California Dental Ass'n v. F.T.C.*, 526 U.S. 756, 769–70 (1999) (some citations omitted).

In this case, the Court finds that the likelihood of anticompetitive effects of the radius clauses at issue is comparably not as obvious or as easily ascertained as with the restraints cited above. Likewise, the procompetitive justification proffered by React – to protect attendance at React's events from being diminished by fans attending another performance of a featured artist elsewhere near the same date and location – is not as easily rejected. The Court next turns to the rule of reason analysis.

### d. Rule of Reason

"Unlike the *per se* rule, the rule of reason utilizes a burden-shifting framework that allows the court to analyze the history of the restraint and the restraint's effect on competition." *In re Southeastern Milk Antitrust Litig.*, 739 F.3d at 271-72. The plaintiff must first establish a *prima facie* case by showing: (1) that the defendant contracted, combined or conspired; (2) that the scheme produced anticompetitive effects; (3) that the scheme affected relevant product and geographic markets; (4) that the scheme's goal and related conduct was illegal; and (5) that the restraint was the proximate cause of plaintiff's antitrust injury. *Id.* at 272. If the plaintiff establishes a *prima facie* case, the burden then shifts to the defendant to produce evidence that the restraint at issue has "procompetitive

effects" that are sufficient to justify the otherwise anticompetitive injuries. *Id.* If the defendant meets this burden, the plaintiff must then show that any legitimate objectives can be achieved in a substantially less restrictive manner. *Id.* An agreement violates the rule of reason if it "may suppress or even destroy competition," rather than promote competition. *Am. Needle, Inc. v. Nat'l Football League*, 500 U.S. 183, 203 n.10 (2010), *quoting Bd. of Trade of Chicago v. United States*, 246 U.S. 231, 238 (1918).

React argues that the antitrust counterclaim should be dismissed because Defendants have failed to establish the first, second, third, and fifth elements of their *prima facie* case. The Court examines the elements at issue in turn.

### i. Contracted, Combined, or Conspired

React first argues that Defendants have failed to establish the first element of their *prima facie* case. According to React, Defendants cannot rely on the co-promotion agreement between React and Eagle because they were a party to that agreement. React also argues that Defendants' allegations regarding the performance contracts between React and EDM artists containing the radius clauses are completely devoid of detail.

As discussed above, the alleged violations of the Sherman Antitrust Act are the individual performance contracts containing radius clauses between React and the EDM artists, not Eagle's co-promotion agreement with React. Construing the

Counterclaim in the light most favorable to Defendants, Defendants have alleged that React required hundreds of EDM artists to sign radius clauses in order to play at React's events throughout the year. These radius clauses restricted the artists' ability to play any other shows within up to a 500-mile radius of the location of React's event for up to 120 days before and after the event. The Court finds that Defendants have sufficiently alleged that React contracted with the EDM artists, satisfying the first element of their *prima facie* case at this stage.

### ii. Adverse Competitive Effect

React next argues that Defendants cannot establish the second element of their *prima facie* case because they have only alleged individual injury, and have failed to allege any adverse anticompetitive effect on the market as a whole. React notes that the Counterclaim lacks details regarding the alleged radius clauses.

"[B]ecause the Sherman Act was intended to protect competition and the market as a whole, not individual competitors, the foundation of an antitrust claim is the alleged adverse effect on the market." *Care Heating*, 427 F.3d at 1014 (internal citations omitted).

Defendants' Counterclaim alleges that React hired hundreds of EDM artists to play at its various events throughout the year and required them to agree to radius clauses in their performance contracts restricting their ability to perform within up to 500 miles of React's events for up to 120 days before and after the

events. According to the Counterclaim, most of React's music events took place in Chicago, and the Metro Detroit area is well within a 500 mile radius of Chicago. Defendants further allege that many of the nationally recognized EDM artists that Defendants book to play at Elektricity and elsewhere in Metro Detroit were subject to a radius clause in their performance contract(s) with React for one or more of React's events. Defendants allege that Eagle was forced to enter into the co-promotion agreement with React and give React half of any and all profits generated from EDM concerts in order to be able to book nationally recognized EMD artists that were subject to the radius clauses which React would not otherwise waive.

According to the Counterclaim, the performance contracts between React and EDM artists unreasonably restricted price and cost of competition among EDM concert venues by limiting or preventing EDM concert venues in competition with React from obtaining talent and competitive prices/costs for EDM concerts in Metro Detroit. The performance contracts unreasonably restricted the ability of EDM concert venues in Metro Detroit to offer concerts to EDM fans whatsoever unless subjected to React's co-promotion agreements demanding half of all the profits. The performance contracts further unreasonably limited entry and expansion of competitors or potential competitors of React in the EDM concert market in Metro Detroit. The Counterclaim also alleges that the

performance contracts raised the costs to produce EDM concerts for competitors of React and, in turn, the prices of EDM concert tickets for EDM fans in Metro Detroit.

Based on the allegations in the Counterclaim, the Court finds that it is plausible that the radius clauses in the performance contracts have anticompetitive effects on the EDM market in Metro Detroit, and that Defendants have satisfied the second element of their *prima facie* case at this stage.

### iii. Product Market

React argues that Defendants have failed to sufficiently identify the relevant product market because the Counterclaim contains no allegations regarding React's competitors. React further argues that Defendants have failed to allege facts to support its conclusion that the market is limited to EDM music.

Defendants respond that the relevant product market is EDM performances by nationally recognized EDM artists that can fill larger venues. Defendants argue that the product market should be defined in terms of EDM music and not in terms of music as a whole because these products are not interchangeable.

Relevant product or geographic markets are sufficiently alleged as long as the allegations in the complaint bear a "rational relation to the methodology courts prescribe to define a market." *Todd v. Exxon Corp.*, 275 F.3d 191, 199-200 (2d Cir. 2001). Courts hesitate to grant motions to dismiss for failure to plead a

relevant product market because market definition is a fact-intensive inquiry into the commercial realities faced by the consumers. *Id.* at 199-200; *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 467 (1992). A product market consists of products that have "reasonable interchangeability." *Spirit Airlines, Inc. v. Northwest Airlines, Inc.*, 431 F.3d 917, 933 (6th Cir. 2005).

> The definition of relevant market, therefore, turns on a determination of available substitutes. . . . Reasonable interchangeability . . . includes analysis of cross-elasticity of demand. Demand for a product is said to be "elastic" if an increase in the price causes less of the product to be purchased. There is said to be "cross-elasticity" of demand" between two products if rising prices for product A cause consumers to switch to product B. . . .

> A different product market may be founded upon a distinction between products in degree as opposed to a distinction between products in kind. Within the universe of a product market, therefore, there may exist a submarket—a portion of the product market that, for purposes of the specific antitrust case, is considered a separate market. The boundaries of an antitrust submarket are determined by examining practical indicia, such as (1) industry and public recognition of the submarket as a separate economic entity and (2) the product's unique and distinct uses, qualities, price, price sensitivity, production facilities, consumers, and vendors.

*Nobody In Particular Presents, Inc. v. Clear Channel Commc'ns, Inc.*, 311 F. Supp. 2d 1048, 1075, 1081 (D. Colo. 2004).

According to the Counterclaim, Elektricity is a concert venue exclusively for EDM artists, and featuring concerts and performances by nationally recognized EDM artists is essential to Defendants' business. The Counterclaim alleges that each of React's annual festivals featured as many as 100 EDM artists, and React

prohibited a substantial number of nationally-recognized EDM artists from performing in Metro Detroit unless React obtained half of any and all profits. React allegedly limited or prevented EDM concert venues in competition with React from obtaining talent and competitive prices/costs for EDM concerts in Metro Detroit, and unreasonably restricted the ability of EDM concert venues in Metro Detroit to offer concerts to EDM fans whatsoever unless subjected to React's co-promotion agreements demanding half of all the profits. The Counterclaim alleges that React unreasonably limited entry and expansion of competitors or potential competitors of React in the EDM concert market in Metro Detroit.

Viewing the facts in the light most favorable to Defendants and drawing all reasonable inferences in their favor, EDM performances by nationally recognized EDM artists are recognized by the industry and concert goers as a unique submarket with distinct qualities. Some venues, such as Elektricity, play EDM music exclusively and attract a crowd that specifically seeks out EDM music. Additionally, nationally recognized EDM artists work only with certain EDM promoters, such as React and Defendants, and perform only at certain venues and events, such as the music festivals produced and operated by React. As the court observed in *Nobody In Particular Presents*, just as "rock concerts have a distinctive customer base, common sense supports [the] assertion that consumers

do not view non-rock concerts as substitutes for rock concerts." 311 F. Supp. 2d at 1084. The same could be said of EDM concerts versus non-EDM concerts.

Based on the allegations in the Counterclaim, the Court finds that Defendants have plausibly alleged a product market, EDM performances by nationally recognized EDM artists, and Defendants are not required to allege a market-by-market analysis at the pleading stage.

### iv. Geographic Market

React argues that Defendants have failed to sufficiently identify the relevant geographic market. React notes that the Counterclaim contains no allegations regarding the geographic area from which React, Defendants, or other allegedly affected venues draw customers.

Geographic markets need not be alleged or proven with "scientific precision," nor defined "by metes and bounds as a surveyor would lay off a plot of ground." *United States v. Conn. Nat'l Bank*, 418 U.S. 656, 669 (1974); *United States v. Pabst Brewing Co.*, 384 U.S. 546, 549 (1966); *White & White*, 723 F.2d at 503. The complaint need only present sufficient information to plausibly suggest the contours of the relevant geographic market. *Jacob v. Tempur-Pedic Int'l, Inc.*, 626 F.3d 1327, 1336 (11th Cir. 2010). Because convenience of location is essential to effective competition in most service industries, geographic markets are analyzed by using a "localized approach," and a metropolitan area may be

considered an appropriate geographic market. *See Conn. Nat'l Bank*, 418 U.S. at 668-70; *United States v. Marine Bancorporation, Inc.*, 418 U.S. 602, 619 (1974).

According to the Counterclaim, Elektricity is a nightclub in Pontiac, Michigan. Defendants are in the business of booking EDM artists to play at Elektricity and elsewhere in Metro Detroit, including at Masonic Temple Theatre (located in Detroit, Michigan), Populux (located in Detroit, Michigan), Majestic Theatre (located in Detroit, Michigan), Russell Industrial Center (located in Detroit, Michigan), and Lot 9 (located in Pontiac, Michigan). React and Eagle co-promoted approximately 200 EDM concerts in the aforementioned venues, all located in the Metro Detroit area, pursuant to their co-promotion agreement waiving the radius clauses in the performance contracts in exchange for half of any all profits. Given that the nightclub and concert industry is a service industry in which convenience of location is an important driver, one can reasonably infer that most patrons / concert goers at the aforementioned venues came from the Metro Detroit area.

Based on the allegations in the Counterclaim, the Court finds that Defendants have at this stage plausibly and sufficiently alleged a localized geographic market, Metro Detroit.

*v.  Market Power*

React argues that the antitrust counterclaim should be dismissed because Defendants have failed to allege that React had sufficient market power.

To sufficiently plead market power, the complaint must "provide sufficient factual predicate to support its allegations that the defendants enjoy market power in the relevant market." *Found. for Interior Design v. Savannah Coll.*, 244 F.3d 521, 530-31 (6th Cir. 2001). "Market power is normally inferred from the possession of a substantial percentage of the sales in a market carefully defined in terms of both product and geography." *Mfrs. Supply Co. v. Minnesota Mining & Mfg. Co.*, 688 F. Supp. 303, 307 (W.D. Mich. 1988) (internal quotations omitted). Market power may also be inferred from the possession of substantial control of the supply side of a unique product market. *See Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Okla.*, 468 U.S. 85, 112 (1984).

According to the Counterclaim, React produced four music festivals per year featuring as many as 100 EDM artists at each festival. Defendants allege that virtually every nationally recognized EDM artist performed at one or more of React's events each year. The Counterclaim further alleges that React required the EDM artists it hired to agree to radius clauses in their performance contracts restricting their ability to perform within up to 500 miles of React's events for up to 120 days before and after the events. According to the Counterclaim, most of

React's music events took place in Chicago, and the Metro Detroit area is well within a 500 mile radius of Chicago. Defendants allege that many nationally recognized EDM artists that Defendants book to play at Elektricity and elsewhere in Metro Detroit were subject to radius clauses in their performance contract(s) with React for one or more of React's events. Defendants allege that they were forced to enter into the co-promotion agreement with React and to give React half of any and all profits generated from EDM concerts in order to be able to book nationally recognized EMD artists that were subject to the radius clauses which React would not otherwise waive. One can reasonably infer that other local promoters attempting to book nationally recognized EDM artists at venues in Metro Detroit were faced the same predicament as Defendants.

Viewing the facts in the light most favorable to Defendants, React had substantial control of the supply side of EDM performances by nationally recognized EDM artists in Metro Detroit. React had control over where and when many nationally recognized EDM artists could perform pursuant to the radius clauses (which often encompassed the Metro Detroit area due to its proximity to Chicago). React also had control over whether or not to waive the radius clauses for local promoters such as Defendants, and under which circumstances to do so if at all. The Court finds that the Counterclaim alleges facts from which one can

infer that React had market power over EDM performances by nationally recognized EDM artists in Metro Detroit.

Having found that Defendants have plausibly alleged a product market, a geographic market, and market power in the relevant market, the Court concludes that Defendants have satisfied the third element of their *prima facie* case at this stage.

### vi. Proximate Cause of Antitrust Injury

React's last argument for dismissal of the antitrust counterclaim is that Defendants have failed to allege that the radius clauses were the proximate cause of Defendants' alleged antitrust injury. React argues that Defendants have failed to allege an antitrust injury because they have failed to allege that any entity, person, or consumer other than Eagle suffered adverse effects as a result of the radius clauses.

This argument fails for the same reasons already discussed above. Again, "because the Sherman Act was intended to protect competition and the market as a whole, not individual competitors, the foundation of an antitrust claim is the alleged adverse effect on the market." *Care Heating*, 427 F.3d at 1014 (internal citations omitted).

According to the Counterclaim, the performance contracts between React and EDM artists containing the radius clauses unreasonably restricted price and

cost of competition among EDM concert venues by limiting or preventing EDM concert venues in competition with React from obtaining talent and competitive prices/costs for EDM concerts in Metro Detroit. The performance contracts unreasonably restricted the ability of EDM concert venues in Metro Detroit to offer concerts to EDM fans whatsoever unless subjected to React's co-promotion agreements demanding half of all the profits. The performance contracts further unreasonably limited entry and expansion of competitors or potential competitors of React in the EDM concert market in Metro Detroit. The Counterclaim also alleges that the performance contracts raised the costs to produce EDM concerts for competitors of React and, in turn, the prices of EDM concert tickets for EDM fans in Metro Detroit.

The Court finds that Defendants have sufficiently and plausibly alleged that React's conduct had an adverse effect on competition, output, and prices in the EDM performance market in Metro Detroit. Defendants have satisfied the fifth element of their *prima facie* case at this stage.

Having found that Defendants have sufficiently established the first, second, third, and fifth elements of their *prima facie* case, each of React's arguments fail, and the Court denies React's motion to dismiss the antitrust counterclaim.

## 2. Antitrust Counterclaim Against SFX

### a. Successor Liability

Defendants assert in their counterclaim that SFX acquired React, and that SFX is React's successor.  SFX argues that Defendant's antitrust counterclaims should be dismissed because Defendants failed to allege any factual support for their assertion that SFX is React's successor.  Defendants did not respond to this argument in their Response.

Michigan follows the traditional rule of nonliability for corporate successors who acquire a predecessor through the purchase of assets.  *Foster v. Cone-Blanchard Mach. Co.*, 460 Mich. 696, 702 (1999).

> However, Michigan recognizes five narrow exceptions to the traditional rule of nonliability:  (1) where there is an express or implied assumption of liability; (2) where the transaction amounts to a consolidation or merger; (3) where the transaction was fraudulent; (4) where some elements of a purchase in good faith were lacking, or where the transfer was without consideration and the creditors of the transferor were not provided for; or (5) where the transferee corporation was a mere continuation or reincarnation of the old corporation.

*Stramaglia v. United States*, 377 F. App'x 472, 475 (6th Cir. 2010).

A review of the Counterclaim shows that Defendants have failed to allege any factual support for their assertion that SFX is React's successor.  To the extent that Defendants seek to hold SFX liable for conduct on the part of React prior to April 2014 based on successor liability, such counterclaim is dismissed.

### *b.  SFX's Bankruptcy Reorganization*

SFX next argues that Defendants' antitrust counterclaim is barred by SFX's bankruptcy reorganization.

Defendants state in their Response that, due to SFX's bankruptcy discharge, Defendants concede that they are not pursuing any antitrust counterclaims prior to November 15, 2016.  (Doc # 22, Pg ID 196)

As the Sixth Circuit has explained,

> By operation of the Bankruptcy Code, confirmation of a reorganization plan "discharges the debtor from any debt that arose before the date of ... confirmation."  11 U.S.C. § 1141(d).  Section 101(12) of the Bankruptcy Code defines a "debt" as "liability on a claim."  Pursuant to 11 U.S.C. § 101(5), a "claim" includes a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, [or] unmatured."

*In re Travel Agent Comm'n Antitrust Litig.*, 583 F.3d 896, 901 (6th Cir. 2009).

In February 2016, SFX filed a Petition for Bankruptcy pursuant to chapter 11 of the Bankruptcy Code.  (Doc # 18-2)  In April 2016, Eagle was served with a Notice of Bar Dates for Filing Proofs of Claim, which was May 17, 2016.  (Doc # 18-3; Doc # 18-4)  A bankruptcy Plan of Reorganization was confirmed on November 15, 2016.  (Doc # 18-5)  Accordingly, the Court dismisses any antitrust counterclaim against SFX prior to November 15, 2016.

However, "a successfully reorganized debtor under Chapter 11 of the Bankruptcy Code is liable for any independent conduct that arises after the

confirmation of its bankruptcy plan. In short, the debtor gets a fresh start, but that does not provide a continuing license to violate the law." *In re Travel Agent Comm'n Antitrust Litig.*, 583 F.3d at 902. Defendants argue that the conduct complained of on the part of SFX continues into the present, including after the bankruptcy confirmation date.

Although the Counterclaim may allege a continuing violation, there are no specific allegations regarding any co-promotions between SFX and Defendants, or any attempted co-promotions or bookings of EDM artists on the part of Defendants or any competitor of SFX in Metro Detroit, *after* the bankruptcy confirmation date. The Counterclaim contains no allegations regarding the effective date of the bankruptcy plan, the types of claims that may or may not go forward under the bankruptcy plan, or who may bring or may be enjoined from bringing claims against SFX under the bankruptcy plan. Under these circumstances, the Court finds that Defendants have failed to satisfy their obligation to provide the grounds of their entitlement to relief as required. The Court grants SFX's motion to dismiss the antitrust counterclaim against SFX.

## C. Violation of the Michigan Antitrust Reform Act (Count II)

The Michigan Antitrust Reform Act ("MARA") provides that "[i]t is the intent of the legislature that in construing all sections of this act, the courts shall give due deference to interpretations given by the federal courts to comparable

antitrust statutes, including, without limitation, the doctrine of per se violations and the rule of reason." M.C.L. § 445.784(2). In analyzing MARA claims, both state and federal courts rely on federal case law interpreting the Sherman Antitrust Act. *See, e.g., Partner & Partner, Inc. v. ExxonMobil Oil Corp.*, No. 05-CV-74499, 2008 WL 896052, at *6 (E.D. Mich. Mar. 31, 2008), *aff'd,* 326 F. App'x 892 (6th Cir. 2009); *Blair v. Checker Cab Co.*, 219 Mich. App. 667, 675 (1996).

React, SFX, and Defendants all rely on the same arguments analyzed above to support their positions as to the MARA counterclaims. Accordingly, for the same reasons set forth above, the Court denies React's motion to dismiss the MARA counterclaim and grants SFX's motion to dismiss the MARA counterclaim.

## D. Unjust Enrichment (Count III)

### 1. *Unjust Enrichment Counterclaim Against React*

React argues that the unjust enrichment counterclaim should be dismissed because an express contract already addresses the pertinent subject matter, proceeds from alcohol sales. React further argues that Defendants have failed to allege that there was anything unjust about React's receipt of payments under the co-promotion agreement. Lastly, React argues that even if the co-promotion agreement is illegal, the law leaves the parties where it finds them, and Defendants cannot recover.

Defendants respond that there is no express contract regarding the sharing of alcohol proceeds. Defendants argue that React's receipt of payments for alcohol proceeds was unjust because they were not entitled to such payments under Michigan law, and because the payments were the result of coercion and duress. Defendants further argue that React's alleged violation of the Sherman Antitrust Act is a policy reason sufficient to justify an exception to the general rule against enforcement of an illegal contract.

To establish a claim for unjust enrichment in Michigan, a plaintiff must show: (1) receipt of a benefit by the defendant from the plaintiff, and (2) an inequity resulting to the plaintiff because of the defendant's retention of the benefit. *Belle Isle Grill Corp. v. Detroit*, 256 Mich. App. 463, 478 (2003). "If both elements are established, Michigan courts will then imply a contract to prevent unjust enrichment. However, a contract will not be implied where an express contract governing the same subject matter exists." *Joseph v. JPMorgan Chase Bank, Nat'l Ass'n*, No. 12-12777, 2013 WL 228010 (E.D. Mich. Jan. 22, 2013). "Where a contract governs the relationship of the parties, a cause of action for unjust enrichment will not be recognized." *E3A v. Bank of America, N.A.*, No. 13-10277, 2013 WL 1499560, at *4 (E.D. Mich. Apr. 11, 2013).

The relationship between React and Eagle was governed by an express contract, the co-promotion agreement. (Doc # 1-1) Under the agreement's express

terms, the parties were to split net profits or net losses from all "adjusted gross receipts" less all "approved show costs." "Adjusted gross receipts" was defined to include "concessions commissions." "Concessions," however, was not defined in the agreement. The agreement also included the following provision: "Each Party hereby represents, warrants and agrees that . . . it shall perform its activities under this Agreement in accordance with all applicable Federal, state and local laws and regulations."

The sharing of alcohol proceeds was part of the subject matter governed by the express agreement between React and Eagle. The agreement expressly provided which proceeds the parties were to split and the manner if splitting. The agreement also expressly excluded Defendants' sharing of alcohol proceeds with React because React's name did not appear on the license to use or benefit from the liquor license as required by Michigan law,[2] and both parties expressly agreed to perform under the agreement in accordance with Michigan law. The Court declines to imply another contract between React and Defendants under an unjust enrichment theory, as that would circumvent the express intent of the parties to split concessions commissions in accordance with Michigan law.

---

[2] *See* Mich. Admin. R. 436.1041; M.C.L. § 436.1909.

The Court further notes that Defendants have compromised any right to equitable relief by admittedly participating in illegally sharing alcohol proceeds. As Michigan courts have explained,

> A claim for unjust enrichment is an equitable remedy. A party with unclean hands may not assert claims for equitable relief such as a claim for unjust enrichment. In *Rose v. Nat'l Auction Grp.*, 466 Mich. 453, 463 (2002), our Supreme Court explained the clean hands doctrine as follows:
>
> The clean hands doctrine has been applied to deny equitable relief to parties to a fraudulent contract:
>
> If a contract has been entered into through fraud, or to accomplish any fraudulent purpose, a court of equity will not, at the suit of one of the fraudulent parties ... while the agreement is still executory, either compel its execution or decree its cancellation, nor after it has been executed, set it aside, and thus restore the plaintiff to the property or other interests which he had fraudulently transferred. In other words, any willful act in regard to the matter in litigation, which would be condemned and pronounced wrongful by honest and fair-minded men, will be sufficient to make the hands of the applicant unclean. Further, a person cannot avoid the clean hands doctrine by relying on advice or inducement to engage in a course of conduct where it is plainly evident that the conduct is illegal or unethical. Just as courts will not enforce a contract designed to harm a third party, courts will deny equitable relief when the misconduct is directed at unrelated third parties, if the claims made by plaintiff are inextricably tied to the plaintiff's wrongdoing.

*Ammori v. Nafso*, No. 312498, 2014 WL 308845, at *3 (Mich. Ct. App. Jan. 28, 2014) (internal quotations and citations omitted).

The Court concludes that Defendants have failed to state a claim for unjust enrichment. The Court dismisses Count III of the Counterclaim.

### *2. Unjust Enrichment Counterclaim Against SFX*

SFX argues that that Defendants' unjust enrichment counterclaim is barred by SFX's bankruptcy reorganization.

Defendants state in their Response that, due to SFX's bankruptcy discharge, Defendants are not contesting SFX's motion to dismiss the unjust enrichment counterclaim against SFX.  (Doc # 22, Pg ID 196)

The Court grants SFX's uncontested motion to dismiss the unjust enrichment counterclaim against SFX.

## III.  CONCLUSION

For the reasons set forth above,

IT IS HEREBY ORDERED that Counter Defendant React Presents, Inc.'s Motion to Dismiss Defendants' Counterclaims (Doc # 13) is GRANTED IN PART as to the unjust enrichment counterclaim only, and DENIED IN PART as to the antitrust counterclaim and the MARA counterclaim.

IT IS FURTHER ORDERED that Defendants' unopposed Ex Parte Motion for Leave to File Excess Pages (Doc # 18) is GRANTED.

Dated:  August 23, 2017          s/Denise Page Hood
                                 Chief, U.S. District Court

# CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document was served upon counsel of record on August 23, 2017, by electronic and/or ordinary mail.

s/Julie Owens
Acting in the absence of LaShawn Saulsberry
Case Manager